**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| CHERYL A. SUMMERS, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-05-763 |
| | § | |
| JO ANNE B. BARNHART, | § | |
| COMMISSIONER OF | § | |
| SOCIAL SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER ON**
**MOTIONS FOR SUMMARY JUDGMENT**

On March 2, 2006, the parties consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment, under 28 U.S.C. § 636(c).  The case was then transferred to this court.  Cross-motions for summary judgment have been filed by Plaintiff Cheryl A. Summers ("Plaintiff," "Summers") and Defendant Jo Anne B. Barnhart ("Defendant," "Commissioner"), in her capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry # 13; Commissioner's Motion for Summary Judgment ["Defendant's Motion"], Docket Entry # 7). Defendant has also filed a response to Plaintiff's motion.  (Defendant's Response to Plaintiff's Motion and Memorandum for Summary Judgment ["Defendant's Response"], Docket Entry # 14). After considering the pleadings, the evidence submitted, and the applicable law, the court ORDERS that Plaintiff's motion is GRANTED, and that Defendant's motion is DENIED.  The SSA's final decision on this matter is reversed, under the fourth sentence of 42 U.S.C. § 405(g), and the case is remanded with instructions to the administrative law judge to grant Plaintiff's application and to calculate the benefits due to her.

**Background**

On March 8, 1992, Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act").  (Exhibit ["Ex."] 1, Transcript ["Tr."] at 69-72).  On April 9, 1992, she filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, with a protective filing date of March 17, 1992.[1]  (Ex. 2, *see* Tr. at 1).  In both applications, Plaintiff claimed that she had been unable to work since November 15, 1991, as a result of a mental impairment caused by a head injury; an inability to communicate with others, to understand or to follow verbal directions, or to control her emotions; depression[2]; and a tremor in her hands.  (Plaintiff's Motion at 3; Tr. at 102, 112).  Summers explained that the "head injury" followed improper treatment for a snake bite to her face when she was 18 months old, resulting in high fevers and brain damage.  (Tr. at 51).  Plaintiff later alleged that she also had disabling knee problems.  (Tr. at 323).  It is undisputed that Plaintiff was insured for disability benefits only through December 31, 1996.[3]

The SSA denied Plaintiff's applications on May 1, 1992, finding that she is not disabled under the law.[4]  (Ex. 3, Tr. at 73; Ex. 4, Tr. at 75).  Plaintiff petitioned, unsuccessfully, for a reconsideration

---

[1] This application is not included in the administrative record.

[2] In this context, "depression" is "an abnormal emotional state characterized by exaggerated feelings of sadness, melancholy, dejection, worthlessness, emptiness, and hopelessness that are inappropriate and out of proportion to reality."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 467 (5th ed. 1998).

[3] Although Plaintiff's knee pain was considered during the administrative process, the earliest reference to it is in 1999 reports from the Harris County Hospital District, more than two years after the last date on which she was insured, for purposes of DIB.  (Ex. B-17, Tr. at 411; Tr. at 326, 329-30).

[4] While the rules governing DIB and SSI differ, an applicant seeking either benefit must first prove that she is "disabled" within the meaning of the Act.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3) and (a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  Under both provisions, the term "disability" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

of that decision.  (Ex. 6. Tr. at 91; Ex. 7, *see* Tr. at 1).  As summarized below, that began a 14-year administrative process which ultimately lead Plaintiff to seek relief in this court.

Following the SSA's initial denial of her claims, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Ex. 8, Tr. at 93-94).  That hearing took place on February 15, 1994, before ALJ Walter R. Wertheim.  He denied her applications on April 20, 1994.  (Ex. 27, Tr. at 273-85).  On May 21, 1994, following Plaintiff's request, the SSA Appeals Council ("Appeals Council") reviewed that decision, vacated it, and remanded the case with an order to the ALJ to obtain evidence from a vocational expert.  (Ex. 28, Tr. at 286-89; Ex. 30, Tr. at 290-92).  On January 24, 1995, ALJ Ronald B. Safren conducted a hearing on remand.  On September 15, 1995, he also denied  Plaintiff's applications.  (Tr. at 12, 15).  Summers again requested an Appeals Council review, but that request was denied, making the ALJ's 1995 findings final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  (Tr. at 4-5, 6).  On July 9, 1997, Plaintiff filed a complaint, appealing that decision under 42 U.S.C. § 405(g), in the United States District Court for the Southern District of Texas.  *Summers v. Apfel*, 4:97-CV-02354 (S.D. Tex.).  In response, the Commissioner filed an unopposed motion to remand, which was granted on November 15, 1998.  *See id*.

On November 1, 1999, ALJ Gerald L. Meyer heard Plaintiff's case for the third time.  (Tr. at 343).  After reviewing the evidence and the testimony presented, he denied her applications on January 4, 2000.  (Tr. at 340-52).  Summers filed written exceptions to this decision on February 2, 2000, and, on May 6, 2000, the Appeals Council remanded the case, yet again, with instructions that the ALJ develop the record further on Plaintiff's mental and physical impairments, as well as on any functional limitations on her ability to work.  (Tr. at 420-22).

---

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

On July 9, 2001, then, ALJ Christopher L. Williams[5] held the fourth hearing on Summers's claim. (Tr. at 541). Summers appeared and testified at the hearing, and she was accompanied by her attorney, Donald Dewberry. (Tr. at 539). The ALJ also heard testimony from Summers's mother, Lola Slater ("Ms. Slater"), and two expert witnesses, a neuropsychologist, Robert P. Borda, Ph.D. ("Dr. Borda"), and a vocational expert, Phillip W. Roddy ("Mr. Roddy"). (*Id.*).

On August 23, 2001, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.  An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.  An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.  If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this

---

[5] It is unclear whether this ALJ actually conducted the hearing, or whether this is an error in the record. The decision which was issued, on August 23, 2001, was apparently signed by ALJ Harry L. Williams, Jr. (Tr. at 334).

4

analysis, Summers has the burden to prove any disability that is relevant to the first four steps. *Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial

gainful work which exists in the national economy." *Greenspan*, 38 F.3d at 236 (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Plaintiff has "borderline intellectual functioning, depression, a speech impediment, tremors in her hands and left knee problems." (Tr. at 324). Although he determined that these impairments, in combination, are severe, the ALJ concluded, ultimately, that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.[6] (Tr. at 324, 332-33). He also found that Summers is unable to return to any of her previous work as a punch press operator; a packer; a shoe inspector; or a machinist. (Tr. at 330). At step five of his analysis, however, he found that she has the residual functional capacity to perform other work that is available in the national economy. (Tr. at 333). He determined that, although her limitations prevent her from doing a full range of light work, she can manage more than strictly sedentary jobs. (*Id.*). He also found that a significant number of such jobs are available, including ones folding laundry, sorting retail products, and counting and bundling goods. (*Id.*; *see* Tr. at 591). For that reason, the ALJ concluded that Plaintiff is "not under a 'disability' as defined in the Social Security Act" and he denied her applications for benefits. (Tr. at 333-34).

On August 28, 2001, Plaintiff again requested an Appeals Council review of the latest ALJ decision. (Tr. at 317). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances are present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not

---

[6] A claimant is presumed to be "disabled" if her impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 & 416.1470.  On January 4, 2005, more than three years after the ALJ's decision, the Appeals Council denied her request, concluding that no basis for review existed under the regulations.  (Tr. at 308).  With that ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On March 9, 2005, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Plaintiff's Original Complaint ["Complaint"], Docket Entry # 1).

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied.  *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *Johnson*, 864 F.2d at 343.

**Discussion**

Plaintiff asks this court to reverse the Commissioner's decision, and to render judgment in her favor for a number of reasons. First, she claims that the ALJ failed to evaluate her mental impairments in accordance with the governing regulation, 20 C.F.R. § 404.1520A. (Plaintiff's Motion at 13). Next, she alleges that the ALJ erred by not properly crediting her mother's testimony on her limitations, even though he found her to be believable. (*Id.* at 13-14). Plaintiff also claims that the ALJ erred in rejecting pertinent parts of the expert witness's testimony, and in his failure to fully evaluate the functional limitations which result from her hand tremors. (*Id.* at 14). Finally, Plaintiff argues that the ALJ erred by posing an incomplete hypothetical question to the vocational expert witness. (*Id.*). Defendant insists, however, that the ALJ properly considered all of the available evidence, and that he followed the applicable law in determining that Summers is not disabled. (Defendant's Response at 11).

In evaluating these arguments, the court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings, and whether the proper legal standards were applied. *Myers*, 238 F.3d at 619. To do so, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about pain; and Plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126. Any conflict in the evidence is to be resolved by the ALJ and not the court. *Newton*, 209 F.3d at 452.

### *The Evidentiary Record*

In her disability applications, Plaintiff has consistently complained that she is unable to work because of her combined physical and mental impairments. These latter impairments include a low

intellectual capacity and depression, both of which render her unable to tolerate stress, to communicate with others or control her emotions, as well as causing difficulty in understanding or following verbal directions.  (Plaintiff's Motion at 3; Tr. at 102, 112).  She also alleges that the persistent tremor in her hands is so limiting that it precludes employment.  (*Id.*).  More recently, she has claimed that debilitating knee pain is an additional impediment to her ability to engage in competitive employment.  (Tr. at 323).

On May 6, 2000, when Plaintiff's case was remanded for the third time, the Appeals Council cited numerous deficiencies in ALJ Meyer's decision.  (Ex. B-19, Tr. at 420-22).  It noted, specifically, that:

> The record is unclear regarding the severity of the claimant's left knee patellar subluxation[7] and her tremors.  The medical evidence of record contains physical therapy notes only on the knee complaints and refers to neurological testing done for her tremors . . . however, none of the clinical findings were made available to the [ALJ] and warrant further development.

(Tr. at 420).  The Appeals Council also found the record equally "unclear" on other aspects of Summers's claims, as follows:

> Additional testing obtained prior to the last hearing showed a 16-point drop in performance IQ[8] between 1991 and 1999.[9]  She alleges special education placement in school and has given conflicting information regarding a closed head injury as a child. . . .  She also alleges an inability to keep jobs secondary to performance problems, but the record documents that she quit her last several jobs to either move to another state or enter training programs.  The conflicts raise questions about both the nature and severity of her diagnosed impairments and her credibility.  Further

---

[7] "Patellar subluxation" is an incomplete dislocation of the knee cap.  *See* STEDMANS MEDICAL DICTIONARY (27th ed. 2000) [Westlaw 2006].

[8] An "IQ," or "intelligence quotient," is defined as "a numeric expression of a person's intellectual level as measured against the statistical average of his or her age group."  MOSBY'S at 847.

[9] Plaintiff's performance IQ was 96 in 1991, and 80 in 1999.  (Tr. at 327).  When she was tested again in 2000, her score was 85.  (*Id.*; *see infra.*).

development is needed to fully document the claimant's mental status, and provide a basis for a Psychiatric Review Technique form, which was missing from the hearing decision.

( Tr. at 420-21).   Because of these deficiencies and evidentiary gaps, Plaintiff's applications were remanded, with specific instructions that the new hearing officer clarify or augment the record in the following ways:

> obtain additional evidence from a medical expert regarding the claimant's mental impairment.  The expert shall be asked to address the nature and severity of her impairments and the significance of the drop in testing scores.  The [ALJ] shall then give further consideration to the severity of the claimant's impairments and her residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of the assessed limitations. . . .  In so doing, he shall evaluate the treating and examining source opinions in accordance with [SSA rules and the claimant's credibility]. . . .

> obtain evidence from a vocational expert to determine whether the claimant's vocational profile permits her to perform work existing in significant numbers in the national economy.  The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole.  The [ALJ] will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy . . . .

> take any further action needed to complete the administrative record, provide the opportunity for a hearing, and issue a new decision, with a Psychiatric Review Technique form appended.

(Tr. at 421-22).

Following the remand order, Summers's attorney supplied the ALJ with additional medical records from the Harris County Hospital District ("HCHD") and from the M.L.K. Clinic ("MLK"). These date from December 28, 1998, through June 8, 2000, and were intended to supplement the clinical data that the Appeals Council noted was absent from the record.  The earliest of these reports, from December 28, 1998, merely documents Summers's treatment for chest congestion.  (Ex. B-21, Tr. at 446).  At that time, she was diagnosed as suffering from tobacco abuse, but her benign essential

tremors[10] were recorded in the report, as was the fact that she was taking Prozac[11] for depression. (*Id.*).

The next record, dated March 17, 1999, notes that Summers had suffered a knee injury and was receiving physical therapy to treat it.  (Tr. at 445).  In these notes, Summers is said to be suffering from depression, essential tremors, and patellar subluxation.  (*Id.*).  On April 12, 1999, a physical therapist, Laurene Bramlett ("Ms. Bramlett"), commented on both Summers's patellar subluxation and the benign essential tremors.  (Tr. at 444).  On that day, Ms. Bramlett reported that Summers had stopped taking Prozac, despite the fact that the medication was helpful to her.  (*Id.*). Two days later, at a clinical visit on April 14, 1999, the diagnoses of patellar subluxation, depression, and tremors were repeated.  (Tr. at 443).  Summers continued to receive physical therapy from April 21, 1999, through July 28, 1999, because of her complaint that her kneecaps "popp[ed] out" approximately twice each week.  (Tr. at 440).  However, Plaintiff never completed the recommended treatment regimen.  (Tr. at 440-42).

On March 31, 2000, Summers was again examined at HCHD.  (Tr. at 438).  On that date, Elaine Wendt, M.D. ("Dr. Wendt"), reported that Summers had been prescribed Prozac for several years to combat major depression, but that she was no longer taking the medication.  (*Id.*).  Dr. Wendt diagnosed Summers as suffering from major depression and, perhaps, "PDD."[12]  (*Id.*).  Among Dr.

---

[10] A "benign essential tremor" is "an involuntary fine shaking of the hand, the head, and the face, especially during routine body movements."  MOSBY'S at 90.  By definition, an essential tremor "is aggravated by activity and emotion and can be reduced in some patients by the administration of mild sedatives."  *Id.*

[11] Prozac is an oral antidepressant medication.  *Id.* at 1340.

[12] Presumably a reference to "pervasive developmental disorder," which is often abbreviated as "PDD."  *Id.* at 1246.  PDD is defined as "any of certain disorders of infancy and childhood that are characterized by severe impairment of relatedness and behavioral aberrations previously identified as childhood psychoses."  *Id.* at 1246-47.  Such disorders include "autism, childhood schizophrenia, and symbiotic psychosis."  *Id.* at 1247.

Wendt's treatment recommendations was a resumption of Prozac to treat her persistent depression. (*Id.*). On June 2, 2000, Summers had a follow-up appointment with Dr. Wendt, and the diagnoses of depression, possible PDD, a benign essential tremor, and recurrent knee dislocation were again recorded. (Tr. at 432). Dr. Wendt also suggested the possibility that Plaintiff suffers from schizophrenic affective disorder.[13] (*Id.*). She recommended orthopedic and psychiatric consultations, as well as a new medication, Primidone,[14] to treat Summers's tremors. (*Id.*).

Finally, on June 7, 2000,[15] a radiologist, Jack Edeiken, M.D. ("Dr. Edeiken"), examined the x-rays taken to assess Plaintiff's complaints of knee pain and frequent dislocation. (Tr. at 431). Those x-rays revealed that "[t]he bones, soft tissues and joints of the right knee are normal. A small osteochondroma[16] of the proximal end of the fibula[17] is noted." (*Id.*).

In addition, the ALJ reviewed the medical records from Ben Taub Hospital, dated April 2, 2000, through August 14, 2000. On April 2, 2000, Summers had an orthopedic evaluation, from which the doctor concluded that she had "B crepitus[18] & minimal effum RSL."[19] (Ex. B-22, Tr. at 457). On June 2, 2000, Summers had another psychiatric assessment, at which it was noted that she

_____

[13] "Schizophrenia" is a psychotic disorder "characterized by gross distortion of reality, disturbances of language and communication, withdrawal from social interaction, and disorganization and fragmentation of thought, perception, and emotional reaction." *Id.* at 1456.

[14] Primidone is an anticonvulsant, often prescribed for treating seizure disorders. *Id.* at 1323.

[15] The record was dictated and transcribed on June 8, 2000.

[16] An "osteochondroma" is "a benign tumor composed of bone and cartilage." MOSBY'S at 1165.

[17] The "fibula" is "one of the two bones of the lower leg, lateral to and smaller in diameter than the tibia." *Id.* at 634. The "tibia" is "the second longest bone in the skeleton, located at the medial side of the leg." *Id.* at 1618.

[18] Presumably referring to a crackling noise caused by the "rubbing of bone fragments" in the knee. *See id.* at 415.

[19] This handwritten diagnosis is only marginally legible, however.

was taking Prozac, but was "in need of psychotherapy." (Tr. at 456). The examining psychiatrist expressed a concern that the true cause of Plaintiff's recurrent psychiatric symptoms may be "schizophrenia vs. PDD." (*Id.*). She also took note of Summers's tremors, which were described as "likely benign essential tremors." (*Id.*).

On July 31, 2000, Summers returned to Ben Taub, again complaining of knee pain. (Tr. at 455). The results of a "bilateral knee/AP & lateral" x-ray showed that both of Summers's knees were normal, and "[t]he bony structures are intact. The medial lateral, and patella femoral joint spaces are maintained. No soft tissue abnormalities are noted." (Tr. at 454). Ultimately, Summers was diagnosed as suffering from symptomatic patella subluxation, and she was instructed to do strengthening exercises and to wear a knee brace. (Tr. at 455).

On August 14, 2000, Summers met with Paul Hoisington ("Hoisington"), LMSW-ACP, to obtain a copy of her previous psychological testing, which had been completed in March 1999. (Tr. at 449). Hoisington reported that Plaintiff denied current medical problems, but he did note that she was in treatment in the outpatient psychiatric clinic. (*Id.*). The psychiatric clinic record, also dated August 14, 2000, shows that Plaintiff stated that she had a learning disability, that she began treatment for depression in 1992, and that she had been "on and off Prozac" for the past eight years. (Tr. at 451). She also reported difficulties in her concentration and memory. (*Id.*). In the diagnoses section, Summers was said to have a depressive disorder, possibly due to dysthymia[20]; borderline intelligence; and knee subluxation. (Tr. at 451-53). Summers was instructed to continue taking Prozac. (*Id.*). In addition, the record from that day states that "[c]urrently she denies any [symptoms] of depression or anxiety. She has difficulty recalling any of her [symptoms] of depression." (Tr. at

---

[20] "Dysthymia" is defined as "a form of chronic unipolar depression." MOSBY'S at 527. "Unipolar depression" is "a major disorder of mood that is characterized by symptoms of depression only." *Id.* at 1676.

452).  It was suggested that Summers be referred for "neuro-psych testing."  (Tr. at 453).

On October 31, 2000, an internist, Donald Gibson II, M.D., P.A. ("Dr. Gibson"), examined Summers on behalf of the state.  (Ex. B-23, Tr. 458-61).  Dr. Gibson recounted Summers's medical history and complaints as follows:

- Depression.  Patient has history of severe depression, anxiety, and tremor. She has been medicated for depression for many years.  She continues to have difficulty with insomnia, headaches, occasional suicidal thoughts, depressed mood, and constant tremor.  Sometimes her tremor will become severe if there is substantial mental or physical stress.  Patient has been followed at the mental health center and continues anti depression medication.  There is no history of psychosis.

- Knee Pain.  Patient has history of some instability in the knees.  She has had x-rays, which were normal in the past, but she still has occasional instability in the interior knee region.  She wears some knee supports.  She has occasional giving way but is able to walk, stand, and sit for normal intervals. There is no history of paralysis, severe arthritis, and the patient does not require any assistive devices for general ambulation.

  Her upper extremity function is normal.  There is no evidence of spinal disorder.  She requires no pain medication.

(Tr. 458-59).  Dr. Gibson found Summers to be "a pleasant female who is nervous and anxious with a resting tremor."  (Tr. at 459).  In sum, Dr. Gibson assessed Summers in the following manner:

1. Depression.  Moderate to severe with periods of mood swings and instability requiring antidepressant medication.  The patient also has severe anxiety, tremor, and phobia.  She may have difficulty with social and outside activities.  She typically requires the assistance of family members for driving, shopping, and other similar duties.  She is able to dress herself and perform daily hygiene activities.  There is no evidence of psychosis or mental retardation.  Patient was able to communicate fairly well with normal vision and hearing.

2. Knee Pain.  Mild.  No severe instability, swelling, deformity, and patient were [sic] able to sit, stand, and walk in the normal office setting.  Her squat was 50% of normal and there was no evidence of spinal disorder or generalized arthritic condition.

(Tr. at 461).

14

On February 1, 2001, Lindsay Rosin, Ph.D. ("Dr. Rosin"), of the MEDTEX Medical Testing & Examinations Center, evaluated Summers, also at the request of the state. (Ex. B-24, Tr. at 466). After conducting a full review, including a psychological examination; a battery of tests; IQ and mental status evaluations, as well as achievement, personality, and neuropsychological evaluations, Dr. Rosin stated that Summers:

> exhibited a slight hand tremor bilaterally with the right hand greater than the left. She reports having trouble ambulating when her knees are bothering her and says that this occurs on a nearly daily basis. . . . The claimant states that she feels depressed most of the day on a daily basis. She says she cries 4 or 5 times a month for up [to] 15 to 30 minutes at a time and does not feel better after crying. She admits to feelings of hopelessness and helplessness. She says she has occasional feelings of guilt "that I don't do anything right." She says sometimes she feels isolated. She has occasional suicidal thoughts of "being better off dead." She has occasional suicidal thoughts of "being better off dead." She has no history of suicide attempts and states that she is "scared of pain" and would not consider making a suicide attempt. She says her resistance to handling stress has become increasingly worse.

(Tr. at 466-67). Dr. Rosin further reported that Plaintiff's personality test results suggest that she:

> is depressed, can be over sensitive to criticism, and may have a long history of interpersonal difficulties and rejection. Paranoid trends are usually evident, and sensitivity, resentfulness, and aggressiveness may be seen. Individuals with similar profiles may read malevolent meaning into neutral situations and jump to conclusions on the basis of insufficient data. An underlying psychotic process may be under way as well.

(Tr. at 469). She also diagnosed Summers as suffering from a dysthymic disorder, assessed her reading ability at a sixth-grade level, and found that she has poor mathematical skills, and only borderline intellectual functioning, in addition to occupational, educational, and social "problems." (Tr. at 470).

On February 5, 2001, orthopedic surgeon Frank L. Barnes, M.D. ("Dr. Barnes"), examined Summers regarding her knee pain. Following his examination, he reported that:

> . . . there is no increased temperature in either knee. There is no swelling in either

knee. There is no anterior or posterior drawer sign in either knee. There is mild crepitation in the left knee only. McMurray's test[21] is bilaterally negative. Lachman's test is bilaterally negative. Patellar compression is painful bilaterally. She is also very apprehensive when one attempts to move the patella laterally in both knees and tightens up her quadriceps. Therefore, I cannot tell [if] there is a significant degree of patellar laxity, but apprehension sign would tend to confirm the probability that she has a laterally subluxation patellae.

(Ex. B-25, Tr. at 474-75). Dr. Barnes estimated that Summers "would be able to function at the light level of work with no squatting, kneeling, stooping or crawling." (Tr. at 475).

Finally, the ALJ had before him progress notes made by Louisa Hernandez, CPC ("Ms. Hernandez"), and Diana H. Vanduzer, LMSW-ACP ("Ms. Vanduzer"), primary clinicians at the Family Service Center. These notes reflect Plaintiff's condition between April 21, 2000, and May 23, 2001. The progress notes record Summers's regular counseling sessions at the center, at which she discussed her depression, mood swings, crying spells, ability to cope in social situations, familial relationships, parenting issues, financial stressors, and her children's medical problems. (Ex. B-32, Tr. at 510-37). Ms. Hernandez characterized Summers as having persistent "multiple depressive symptoms," as well as learning and auditory deficits. (Tr. at 536). She also noted that Plaintiff has been "on + off" Prozac for the past eight or nine years. (*Id.*). In her notes, Ms. Vanduzer mentioned Summers's complaints of weakness in her knees and hands. (Tr. at 525). Additionally, she made note of Summers's apparently compulsive habits "such as picking at scabs which she cannot stop, and consequently has scabs all over her body." (*Id.*).

Prior to the July 2001 hearing, the ALJ had been ordered to consider Summers's consolidated claims for DIB and SSI benefits, and to satisfy the specific deficiencies noted by the Appeals Council

---

[21] Presumably a reference to "McMurray's sign," a test which is said to be positive if a click is heard "when rotating the tibia on the femur, indicating injury to meniscal structures." *Id.* at 995. Meniscal structures in this context are "curved, fibrous cartilage in the knees and other joints." *Id.* at 1011.

in its May 6, 2000 remand order.  (Tr. at 420-22).  Presumably for that reason, Dr. Borda, a neuropsychologist, testified at the hearing as an expert witness, although his opinions were derived solely from a review of Plaintiff's testimony and the available records.  (Tr. at 577-86).  In regard to her physical impairments, Dr. Borda testified that, after consulting the applicable Social Security listings, he was unable to find a neurological category which addressed the tremors that Plaintiff exhibits.  (Tr. at 577-78).  He did consider, however, those listings applicable to mental retardation, autism, and affective disorders, and he determined that Summers did not satisfy the criteria for any of those.  (*Id.*).

Despite his inability to link her impairments to the strict requirements of those designated listings, Dr. Borda testified that, "I do think . . . that she has some functional limitations that would impact her ability to maintain gainful employment."  (Tr. at 578).  In making that determination, he cited the "consistent documentation" that Summers performs tasks slowly, "[w]hich would impact her ability to, I think do anything."  (*Id.*).  From that documented history, he concluded that:

> . . . in terms of the functional capacity to do work I would rate her ability to follow work rules as good, provided they're simplistic and don't change.  Relating to co-workers as fair, interacting with supervisor is fair to poor because that will involve oral interaction.  Dealing with the public is fair to poor for the same reason.  Dealing with ordinary work stress is fair to poor.  She's described . . . as being easily overwhelmed.  Ability to handle low stress is good to fair.  Using judgment is fair. Functioning independently is fair.  Maintaining attention and concentration, fair to poor.   Understanding, remembering, and carrying out complex detailed job instructions is fair to poor.  Simple job instructions is fair.  Maintaining personal appearance is good.  Behaving in an emotionally stable manner is good.  Relating predictability in social situations is good and demonstrating reliability is good. Should benefits be awarded I would recommend that a representative payee be appointed because of her academic skills problem.

(Tr. at 578-79).  Although Dr. Borda is not a vocational expert, the ALJ asked him whether Summers was capable of "simple task positions of relatively low stress with close supervision, yet working

independently." (Tr. at 579). While Dr. Borda agreed with that summary of her abilities, he added that "unfortunately, . . . in most of the jobs I can think of it [sic] that would be appropriate for her would be those that require relatively good fine motor control. And she does have some problems with that." (*Id.*). He then referred to Plaintiff's history of tremors, and remarked on the findings of another psychologist, Mark Lehman, Ph.D. ("Dr. Lehman"), who evaluated Summers in September 1991, at the request of the state. Dr. Borda cited Dr. Lehman's observation that "[a] very significant bilateral hand tremor was readily apparent," but that the "hand tremor did not seem to impact fine motor dexterity." (Ex. 1, Tr. at 150; Tr. at 579-80). Dr. Borda explained:

> There's a difference between resting tremor and intention tremor. And it sounds like what Ms. Summers is -- has [sic] some of both elements. The resting tremor is typical, more like parkinsonian[22] [phonetic] type features, where the -- when the person is not doing anything their [sic] hands will tremble, but then if they [sic] pick up something it'll be stable. And then the intention tremor, which is more cerebellar [sic] is just the opposite. There's no tremor at rest, but then when you start to do something then you see the tremor come out. And it appears that she has been described as having benign essential tremor, which will affect both. [Additionally], from what I understand that is a hereditary disorder. It does tend to get worse with time. Generally treated with Inderal[23] or one of the beta-blocker agents, and usually they are fairly effective for that. But I think it will affect her ability to do fine motor tasks. My guess is that when she was tested before she had primarily a resting tumor, but still was able to perform manipulation of pegs and a group peg port task fairly well, things like that. But that may not be the case now. That was some time ago.

(Tr. at 580).

Finally, the ALJ asked Dr. Borda to speak to the results of Summers's multiple IQ tests. It is undisputed that between 1991 and 1999, the records reflect a 16-point drop in Plaintiff's

---

[22] "Parkinsonian" is something "pertaining to or resembling Parkinson's disease," "a slowly progressive degenerative neurologic disorder characterized by resting tremor . . ." *Id.* at 1210.

[23] Inderal is a "beta-adrenergic blocking agent," an agent that "decrease[s] the rate and force of heart contractions among other effects." *Id.* at 100, 829. In this case, the record reflects that Summers had been given Inderal to address her hand tremors, but did not take it, due to her belief that she could not take Inderal while she was taking Prozac. (Ex. B-8, Tr. at 379).

performance IQ scores.  In September 1991, she received a score of 96 on the performance IQ  test that Dr. Lehman administered.  (Ex. 1, Tr. at 152).  However, on March 18, 1999, a different psychologist, Jim C. Whitley, Ed.D. ("Dr. Whitley"), acting on behalf of the state, again measured Summers's performance IQ.  (Ex. B-8, Tr. at 381).  Dr. Whitley gave her a score of only 80, 16 points lower than the earlier result.  (*Id.*).  On February 1, 2001, Dr. Rosin gave Summers a third test, and this time she scored 85 on the performance IQ.  (Ex. 24, Tr. at 468).  Dr. Borda testified that, in his opinion, the varying test scores may be tied to Plaintiff's emotional state:

> I think that the last test that showed her much lower than the previous one had probably reflected depression. . . .  That probably is a valid reading of her intellectual abilities.  And she has, I think, kind of unusual linguistic processing deficit, sort of a combination of dyslexia[24] and auditory processing so that she may be able to comprehend brief sentences, single words, but up to a certain point then this falls off rapidly.  And so her ability to comprehend instructions that are given to her orally, especially if they're complex, would be very, very poor.  And her ability to retain that information without repetition would be very poor.  But her non-verbal skills are average.

(Tr. at 580-81).

When questioned by Plaintiff's attorney, Dr. Borda made note of a report from yet another neuropsychologist, Larry Pollock, Ph.D. ("Dr. Pollock").  In February 1992, Dr. Pollock also evaluated Plaintiff on behalf of the state.  Dr. Borda testified that he agreed with Dr. Pollock's hypothesis that:

> . . . the client would have difficulty in work activities due to cognitive deficits in following and comprehending verbal instructions, verbal memory, non-verbal memory, [and] academic abilities.

(Ex. 1, Tr. at 156-57; Tr. at 582).  Dr. Borda explained that the more involved any particular instruction is, the more likely Summers is to forget the entire task.  (Tr. at 583).  For that reason,

---

[24] "Dyslexia" is "an impairment of the ability to read, as a result of a variety of pathologic conditions, some of which are associated with the central nervous system."  MOSBY'S at 525.

19

I think she also may have kind of a generalized learning disability because her non-verbal memory also is well below average, and well below her reasoning abilities in non-verbal areas. So she probably has a combination of things, kind of a phonological processing problem, meaning that she has difficulty processing what she hears, a dyslexia, difficulty processing what she reads[, and a] verbal memory problem, that would be consequent to that where she just won't retain what she sees or reads. As well as some non-verbal memory problems, even having some difficulty remembering what she sees or has demonstrated to her. And then the academic abilities, which will just, you know, naturally go along with that. So she has trouble reading, doing arithmetic.

*   *   *

[Non-verbal memory] means being able to remember where things are placed. You know if -- many people have excellent visual [imagery] and although they may not be able to tell you where they put something they can kind of create a visual image in their mind and they can actually see, you know, where in the drawer that thing would be. So that would be impaired. Or even the ability to watch someone do something and then later remember all the steps that were involved. That would be involved in non-verbal memory as well.

(Tr. at 583-84). In response to further questions from her attorney, Dr. Borda testified that Summers did not appear to have an organic mental disorder, as defined by the Social Security regulations, but that such findings are "really reserved for acquired brain injuries, not developmental disorders." (Tr. at 585).

Finally, Dr. Borda addressed Plaintiff's evaluation on March 18, 1999, by Dr. Whitley. (Ex. B-8, Tr. at 378-83; Tr. at 585-86). In his testimony, Dr. Borda referred specifically to the results of trail-making tests[25] that Dr. Whitley administered during his exam. (Ex. B-8, Tr. at 382). These tests revealed that Summers's intellectual functioning was in the "severely impaired range." (Tr. at 381-82). According to Dr. Borda, those results suggest that Summers would be markedly slow in performing even simple sequencing tasks, and that she would have difficulty in maintaining a decent pace when performing "even pretty simple repetitive tasks" in a work setting. (Tr. at 585).

At the hearing, the ALJ asked Plaintiff to discuss her hand tremors. Summers testified that

---

[25] Dr. Whitley describes these as neuropsychological screening instruments which measure "motor and spatial skills as well as the ability to count and follow a sequence." (Ex. B-8, Tr. at 382).

she has suffered from them for a long time, and that they have worsened over the years, although the impact varies: "there's days that it's really, really bad and when I'm shaking like this and stuff I have a little bit of a hard time in writing." (Tr. at 575-76). Summers also testified that the tremors in her right hand are worse than those in the left, and that, because she is right-handed, her handwriting is "kind of squiggly." (Tr. at 575). When the ALJ observed that she had been holding her hands together during the hearing, she explained that doing so reduces the tremors, but that she can still feel herself shaking. (*Id.*). When the ALJ asked her to hold a piece of paper and describe how the tremors affect that task, Plaintiff said, "if that was a cup of something to drink I wouldn't be able to hold it straight. I'd be spilling it." (*Id.*).

Plaintiff's mother, Lola Slater, also testified at the latest hearing. She told the ALJ that her daughter did not talk until she was four years old, and that she had experienced academic and comprehension difficulties from the time she entered the first grade. (Tr. at 554). Ms. Slater told the ALJ that, after she was tested in the third grade, Summers was placed in special education classes, where she remained through high school. (Tr. at 553-54). Ms. Slater also testified that Summers had difficulty keeping jobs because of her failure to follow instructions, her slow pace, and her inability to get along with supervisors. (Tr. at 555). She testified that, at one time, she gave Plaintiff a job at her insurance agency, but so many problems ensued, including her inability to communicate with the public, that she had to be discharged. (Tr. at 557-58). Ms. Slater testified that her daughter had been tested and treated by doctors "all of her growing up years." (Tr. at 556). When asked whether Plaintiff had a "low tolerance for stress," Ms. Slater responded, "Very much so and she can withdraw and sit there and not even know what's going on around her or even hear you." (Tr. at 558).

Finally, Ms. Slater testified about what she perceived to be her daughter's depression. She stated that she knows when Summers is depressed because she gets irritable and raises her voice. (Tr.

at 562).  She added that each time Plaintiff has lost a job, her depression worsens.  (Tr. at 559).  Ms. Slater also testified that she has difficulty persuading her daughter to obtain treatment for her depression and other impairments.  (Tr. at 563).  Indeed, Ms. Slater believes that her daughter does not think that she suffers from physical or emotional problems.  (*Id.*).  She explained that, in her opinion, "if you have a problem [you] try to work it out and take care of it and I don't think she realizes that she has problems because she doesn't work at anything.  She doesn't try to get it worked out."  (*Id.*).

Mr. Roddy, a vocational expert, also testified at the hearing.  Based on his review of the record, as well as the testimony, Mr. Roddy described Summers's work history for the preceding 15 years as unskilled work, which required light to medium exertion.  (Tr. at 587-88).  He also noted her service at Goodwill Industries, although it was not competitive employment, a point which Defendant concedes.  (Tr. at 588; Defendant's Response at 6).  At the hearing, the ALJ posed only one hypothetical question to Mr. Roddy which incorporated any limitations due to Plaintiff's mental impairments. That question and answer are set out below:

> Q   And if because of a combination of her hand tremor and her borderline intellectual functioning, if that would slow her to a pace that she could not meet those production requirements she could not, of course, perform [competitive employment]?
>
> A   That would be correct, sir, if she's unable to maintain pace in order to meet production requirements that would preclude employment.
>
> Q   So the hand tremors with her functioning would -- with that below that base there would be no competitive employment.
>
> A   That would be correct, sir.[26]

(Tr. at 591).  And, in response to a question from Plaintiff's attorney, which did include the further

---

[26]   Ultimately, the ALJ concluded that Summers's combined impairments were not so limiting as to preclude employment, apparently retreating from the limitations detailed in that question.

limiting factor of a poor ability to deal with work stress, Mr. Roddy testified that there would be no "jobs in the national economy that she could perform."  (Tr. at 595).

### *Educational Background, Work History, and Present Age*

Plaintiff does not dispute the ALJ's findings as to her age, education, and work history. (Plaintiff's Motion at 12).  Summers is now 45 years old, and has a high school education, as well as "some vocational or technical schooling."  (*See* Tr. at 323, 330-31).  Her work history includes jobs as "a machinist, a factory worker, a laborer, a punch press operator, a child care provider, [and] a filing clerk."  (Tr. at 323).  And, prior to the most recent hearing on her disability claims, she had participated in a Goodwill Associates training program.  (*Id.*).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  He first determined that Summers had several documented impairments, including "borderline intellectual functioning, depression, a speech impediment, tremors in her hands and left knee problems," and that those impairments were "severe."  (Tr. at 324, 332).  He found further that, due to her impairments, Summers was unable to return to any of her past work.  (Tr. at 330, 333).  However, from his findings, as well as from Mr. Roddy's testimony, the ALJ concluded that Summers is capable of performing a significant number of jobs which exist in the local, regional, and national economy, and so she is "not disabled," under the Act.  (Tr. at 333).  With that conclusion, he ruled that Summers was not entitled to disability insurance benefits or to supplemental security income payments.  (Tr. at 333-34).

From the record as a whole, however, it is evident that the ALJ's decision is not supported by substantial evidence.  As a preliminary matter, in deciding that Summers was not disabled, the ALJ made repeated references to her failures to take medication, or to seek regular treatment, or even to recognize that she suffers from the noted mental impairments.  (*See* Tr. at 325-30).  He cited those

failures in judging her credibility, which he found to be suspect. He then, apparently, gave significant weight to this perceived lack of credibility in determining that Plaintiff is not entitled to benefits. (Tr. at 333). While there is no question that an ALJ has discretion to weigh the credibility of the testimony presented, and that his judgment is entitled to considerable deference, that is so only if his opinion is supported by substantial evidence. *Villa*, 895 F.2d at 1024. In any disability determination, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence." *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988). For this reason, an ALJ may accept or reject a claimant's subjective statements, as long as the reasons for so doing are made clear. *Falco*, 27 F.3d at 164. For example, he may find that the claimant's subjective complaints were "not credible," or he may find the medical evidence to be "more persuasive than the claimant's own testimony." *Id*.

Here, the record does support the ALJ's finding that, at times, Plaintiff has discounted, or even denied, the fact and severity of her mental impairments. (*See* Ex. B-7, Tr. at 361; Ex. B-22, Tr. at 452; Ex. B-23, Tr. at 458; Ex. 24, Tr. at 226). Indeed, Plaintiff's mother testified that Summers fails to recognize that she has problems, and does not appreciate her treatment needs. (Tr. at 563). And the record is clear that Summers is inconsistent in adhering to medication regimens intended to treat her mental condition. (*See* Tr. at 347; Ex. B-7, Tr. at 361; Ex. B-21, Tr. at 438, 444; Ex. B-22, Tr. at 451; Ex. B-24, Tr. at 466). In fact, on April 24, 2001, Ms. Vanduzer noted that, "Client discussed not being on meds for depression any longer - feels she does not need it, and probably never did, at least not since having her children." (Ex. B-32, Tr. at 510). Further, the record details several instances on which Plaintiff avoided treatment for her tremors and knee problems, including a complete neglect of her physical therapy. Finally, Summers conceded her resistance to take medication for her tremors, attributing it to her belief that it interfered with the Prozac she had been prescribed to treat depression. (*See* Tr. at 348; Ex. B-8, Tr. at 379; Ex. B-17, Tr. at 405-14).

While the ALJ was correct in noting Plaintiff's failures to follow recommended treatment or to accept the magnitude of her problems, he found these failures to diminish her credibility in a way that belied disability.  In fact, the evidence suggests the contrary.  Here, not only does the record not support this credibility finding, but there was no expert testimony, at all, on whether Plaintiff's mental impairments themselves may affect her ability to obtain treatment, or even to acknowledge that it is necessary.  In similar instances, some courts have found that it is not unusual for a claimant's mental condition to generate the belief that she has no impairment or needs no treatment when, in fact, she clearly does.  *See Brashears v. Apfel*, 73 F. Supp. 2d 648, 649-51 (W.D. La. 1999) (citing *Mendez v. Chater*, 943 F. Supp. 503, 508 (E.D. Pa. 1996); *Sharp v. Bowen*, 705 F. Supp. 1111, 1123-24 (W.D. Pa. 1989)); *Benedict v. Heckler*, 593 F. Supp. 755, 761 (E.D.N.Y. 1984).  Further, the SSA regulations themselves recognize that a failure to abide by prescribed treatment may require an inquiry into the cause for such medical neglect.  *See* 20 C.F.R. § 404.1530(c) (the ALJ must consider the claimant's mental limitations when determining whether the claimant has an acceptable reason for failing to follow prescribed treatment).  Indeed, "[c]ourts have found that non-compliance [with a prescribed treatment plan] that is the result of a mental impairment may be a justifiable excuse." *Brashears*, 73 F. Supp. 2d at 651 (citing *Lovelace*, 813 F.2d at 59-60; *Scott v. Heckler*, 770 F.2d 482, 486-87 (5th Cir. 1985); *Mendez*, 943 F. Supp. at 508; *Sharp*, 705 F. Supp. at 1123-24).

It is reasonable in this instance, then, to conclude from the record that Plaintiff's failure to pursue all recommended treatment, or even to realize the extent of her needs, is evidence of the degree of her mental impairments, as opposed to evidence that she has exaggerated them or that they are not disabling.  Further, because the ALJ called no medical doctors, whatsoever, who could speak to the medication issues raised by the evidence, it is unknown whether Plaintiff is correct that Prozac and Inderal cannot be taken together.  If she is correct, the limiting impact of her tremors may preclude any employment.  If she is not correct, the ALJ still has incomplete evidence on whether

25

her impairments trigger the failure to receive treatment.  While the ALJ is to be commended for his efforts to adduce evidence on these topics from Dr. Borda, that witness has no medical training, and is not qualified to address medication or other strictly medical issues.  A psychiatrist or some other witness with medical or even pharmacological expertise is much better suited to testify on these matters. Unfortunately, the ALJ did not develop the record on this issue, or even address it in the context of Plaintiff's limitations.  Because the record was not developed, the ALJ did not have substantial evidence from which he could make proper findings about Summers's actual mental condition.  In the absence of that evidence, he chose to make a credibility finding against Summers, which led him to conclude that she is not disabled. Put simply, because the record was not developed on the reason for Plaintiff's inconsistent statements and conduct, the ALJ erred in determining that they render her unbelievable, rather than ill.  *See Villa*, 895 F.2d at 1024.

Further, the ALJ likewise lacked substantial evidence on both the true nature and the actual degree of Summers's emotional disorders which would allow proper findings on her level of impairment.  In determining whether a disability exists, an ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)).  If he fails to do so, his decision is not supported by substantial evidence, and is subject to reversal if the error results in prejudice to the claimant.  *Newton*, 209 F.3d 448 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).  Notwithstanding Summers's own statements and conduct, the record is replete with evidence that she suffers from some type of emotional disorder.  For instance, on February 1, 2001, Plaintiff told Dr. Rosin that she had been treated for depression since 1992, and that "she feels depressed most of the day on a daily basis," and has regular crying spells.  (Ex. B-24, Tr. at 467).  Dr. Rosin added that Summers reported that she feels helpless and hopeless, lacks self-confidence, and said that although she "would not consider

making a suicide attempt," she had occasional thoughts that she would be "better off dead." (*Id.*). Doctors Whitley and Gibson also made note of Summers's repeated suicidal thoughts. (*See* Ex. B-8, Tr. at 379; Ex. B-23, Tr. at 458).  Further, at a June 2000 psychiatric consultation, Summers was seen to be "in need of psychotherapy."  (Ex. B-22, Tr. at 456).  Significantly, just six months later, Dr. Rosin remarked that, "An underlying psychotic process may be underway as well."  (Ex. B-24, Tr. at 469).  Indeed, more than one examining doctor expressed a concern that Summers might actually suffer from schizophrenia or PDD, rather than cognitive deficiencies as a result of an injury.  But the record is silent on whether Plaintiff was ever evaluated for either of those conditions.  (*See* Ex. B-21, Tr. at 432, 438; Ex. B-22, Tr. at 456).  It appears that Plaintiff may have a serious mental disease which warrants further medical inquiry, and, perhaps, a different course of treatment.  Here, the court must conclude that the ALJ did not meet his duty to fully and fairly develop the record on Plaintiff's mental impairments.  Consequently, his decision is not supported by substantial evidence, and the case must be remanded for that reason.  *See Newton*, 209 F.3d at 448; *Ripley*, 67 F.3d at 557.

In addition, Summers also complains that the ALJ failed to comply with the Appeals Council order when her claims were remanded the last time.  If she is correct, that failure also requires scrutiny.  There is no question that an ALJ has a duty to satisfy the orders of the Appeals Council when a case is remanded.  *See Houston v. Sullivan*, 895 F.2d 1012, 1015 (5th Cir. 1989); 20 C.F.R. § 404.977(b); 416.1477(b).  This duty is governed by the administrative regulations, which provide, expressly, that:

> The administrative law judge *shall* take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's order.

*Houston*, 895 F.2d at 1015; 20 C.F.R. §§ 404.977(b), 416.1477(b) (emphasis added).  Because the regulatory language is mandatory, any instructions given in a remand order will govern the procedures to be followed at the subsequent administrative hearing.  (*Id.*).

In this case, while it is clear that the ALJ did obtain some additional evidence on Plaintiff's physical and mental impairments, as he was ordered to do, it is equally clear that he failed to comply with other critical aspects of the order.  In particular, he failed to consider the limitations imposed by Summers's emotional disorder on her ability to work.  In remanding this matter, the Appeals Council ordered the ALJ to ask a vocational expert witness hypothetical questions which "reflect the specific capacity/limitations established by the record as a whole."  (Tr. at 421).  At the last hearing, however, the ALJ's questions to Mr. Roddy incorporated only the limitations resulting from Plaintiff's "borderline intellectual functioning" and hand tremors.  (Tr. at 591).  Those questions did not touch on Summers's long and well documented history of emotional disorders.  (*See* Tr. at 591).  The ALJ's disregard of that explicit Appeals Council instruction alone requires a remand of Plaintiff's disability claim.  *See* 20 C.F.R. § 404.977(b).  Indeed, Fifth Circuit decisions are consistent that, to support a non-disability finding, any hypothetical question that is posed to a vocational expert witness must "incorporate reasonably all disabilities of the claimant [that are] recognized by the ALJ" and that are supported by the objective medical evidence.  *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *see Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000); *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).  If hypothetical questions to the vocational expert do not fairly encompass all of the claimant's limitations, then the witness's response does not constitute substantial evidence to support the ALJ's decision.  *Boyd*, 239 F.3d at 707 (citing *Bowling*, 36 F.3d at 436).

In this case, none of the hypothetical questions which were posed to the vocational expert witness encompassed the full range of Plaintiff's limitations as a result of her emotional disorders, when combined with her persistent tremors, and low level intellectual functioning.  In fact, Mr. Roddy testified that Summers's "ability to deal with work stress is poor, meaning the ability to function in this area is almost absent," then she might "not be employable in competitive

28

employment." (Tr. at 593-95). That testimony is critical because Dr. Borda's testimony was uncontroverted on that very issue. He testified that Plaintiff could tolerate only low stress jobs, but then noted that any otherwise suitable jobs require fine motor control, which Summers lacks. (Tr. at 579). Dr. Borda also testified, without contradiction, that he believed Summers's limitations "would impact her ability to maintain gainful employment." (Tr. at 578). In doing so, he cited the "consistent documentation" that Plaintiff performs tasks slowly, concluding that factor "would impact her ability to, I think do anything." (*Id.*). Mr. Roddy also agreed that, depending on the extent of her other impairments, Summers's slow pace may preclude competitive employment. (Tr. at 591). Moreover, the record holds clear evidence that Summers has difficulty understanding instructions and submitting to authority, in addition to her inability to deal with work stress. In short, the ALJ should have incorporated the totality of Plaintiff's intellectual and emotional limitations, in the hypothetical questions posed to Mr. Roddy. Absent a complete hypothetical question, the ALJ's findings on Plaintiff's residual functional capacity to engage in substantial gainful employment are not supported by substantial evidence.

As a final matter, the court also notes that the ALJ did not attach a Psychiatric Review Technique Form ("PRTF") to his decision, as he was ordered to do by the Appeals Council. While Defendant argues that the current regulations no longer require these forms, the Appeals Council here specifically ordered the ALJ to "issue a new decision, with a Psychiatric Review Technique form appended." (Tr. at 422). Clearly, the ALJ had a duty to complete the form and attach it to his decision. *See Houston*, 895 F.2d at 1015. Based on the glaring evidentiary gaps on Summers's true mental residual capacity, the court is persuaded that, in this instance, a recent PRTF would have proven particularly helpful.

Indeed, the ALJ made credibility findings against Summers based on her intermittent failure to recognize the extent of her disabilities or to follow prescribed treatment regimens. As a result, he

neglected a full consideration of the volume of evidence on Summers's emotional disorders and their impact on her ability to engage in gainful employment.  How far those credibility findings may have encroached on the ALJ's view of the remainder of the evidence cannot be discerned.  There is little doubt, however, that negative credibility findings prejudiced Summers in her application for benefits.  And, not only does the record show that the ALJ should have considered Summers's emotional disorders more closely, but he was told to do so specifically.  The absence of substantial evidence to support the ALJ's decision, considering his failure to comply fully with the Appeals Council's order on remand, persuades the court that the Commissioner's decision to deny Plaintiff benefits must be set aside.

Plaintiff first filed her applications for benefits in 1992.  In the intervening decade and a half, her claim has been subject to four hearings and three remands because of errors made at the administrative level.  The latest decision also requires a remand because of the ALJ's faulty credibility findings, failure to develop the record on Plaintiff's mental impairments, or to comply with the Appeals Council's order.  In reaching this decision, the court is mindful that "it may not reweigh the evidence or try the issues *de novo* or substitute its judgment for that of the Secretary."  *Kane*, 731 F.2d at 1219.  But, as the Fifth Circuit has expressed, repeatedly, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required."  *Newton*, 209 F.3d at 459 (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)).  "If prejudice results from the violation, the result cannot stand." *Id.*  Clearly, Summers's rights were affected when the ALJ abrogated his duty to comply with the Appeals Council's instructions.  *See* 20 C.F.R. § 404.977.  All of these errors have prejudiced Plaintiff in her pursuit of benefits.  Accordingly, her motion should be granted.  Because of the numerous administrative errors, Plaintiff has been without benefits for years while her case wound its way through the regulatory and legal systems.  Summers's case is now poised to circulate through

the administrative process once again.  Instead, the court finds that justice demands that the case be reversed and remanded to the Commissioner with instructions to grant Plaintiff's application and to calculate the disability benefits due her.  *See* 42 U.S.C. § 405(g); *McQueen v. Apfel*, 168 F.3d 152, 156 (5th Cir. 1999).

**Conclusion**

Based on the foregoing, it is ORDERED that Plaintiff Cheryl A. Summers's Motion for Summary Judgment is GRANTED, and that Commissioner Jo Anne B. Barnhart's Motion for Summary Judgment is DENIED.

It is further ORDERED that this matter is remanded to the Commissioner with instructions to grant Summers's applications and to calculate the disability benefits due her.

The Clerk of the Court shall enter this order and provide a true copy to all counsel of record.

SIGNED at Houston, Texas, this 1st day of May, 2006.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**